**Dorothy MOORE, Plaintiff,**

v.

**THE SALLY J., Official Number 620431, her engines, tackle, gear, apparel, furniture and equipment, In Rem, and Western Pioneer, Inc., In Personam, Defendants.**

**No. C97–446Z.**

United States District Court,
W.D. Washington.

April 10, 1998.

Eric Dickman, Dickman Law Group, Seattle, WA, for Dorothy Moore.

Matthew C. Crane, Bauer, Moynihan & Johnson, Seattle, WA, for Western Pioneer, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZILLY, District Judge.

This matter came on for trial on March 26, 1998, before the Court, sitting without a jury. Plaintiff Dorothy Moore was represented by Eric Dickman of the Dickman Law Group. Defendant, Western Pioneer, Inc. was represented by Matthew C. Crane of Bauer, Moynihan & Johnson. At the conclusion of the case the Court took the matter under advisement. The Court has considered the evidence presented at trial, the exhibits admitted into evidence, the deposition testimony of David Miller Wise, M.D. and Greg Coleman, and the arguments of counsel, and being fully advised, now makes its Findings of Fact and Conclusions of Law as follows:

### I.

### FINDINGS OF FACT

1. Plaintiff Dorothy Moore was a seaman and employed by defendant Western Pioneer, Inc. at all pertinent times. Defendant Western Pioneer, Inc. is a corporation and its principal place of business is Seattle, King County, Washington.

2. Defendant vessel, SALLY J, is a commercial freighter owned and operated by Western Pioneer. The vessel's home port is Seattle, Washington. At all relevant times, Moore was employed by Western Pioneer in furtherance of the purposes of the vessel.

3. Beginning in 1990, Ms. Moore worked as a vessel cook for defendant on its vessels. (Exhibit 1) Each trip was the subject of a separate contract between the parties.

4. In January 1996, Ms. Moore joined the vessel SALLY J after it arrived in Dutch Harbor, Alaska on what is referred to as trip no. 104. Ms. Moore remained on that vessel until the end of trip no. 104 on January 31, 1996. Ms. Moore was also the vessel cook for that vessel on trip no. 105 (February 9, 1996, through March 8, 1996), trip no. 106 (March 15, 1996, through April 13, 1996), and trip no. 107 (May 3, 1996, through May 29, 1996).

5. As the vessel cook, Ms. Moore's obligations included cleaning the entire galley area, including the stove, as well as ordering all cooking and cleaning supplies. Ms. Moore had various supplies to clean the galley stove, including grill stones, grill screens, scrubbing sponges, steel wool, detergents, solvents, and oven cleaner. On prior occasions, Moore had used oven cleaner to clean the inside of the galley stove. It was Ms. Moore's custom to keep the galley clean. It was also her practice to give the vessel stove a deep cleaning during the vessel's return voyage to Seattle, Washington.

6. During the return portion of trip no. 106, Ms. Moore was ordered by the vessel master, Captain Larson, to clean the stove "like new." Captain Larson ordered Ms. Moore to clean the stains from the sides of the stove.

7. Moore told Captain Larson she didn't think she could clean the side of the stove "like new." Captain Larson replied that he thought she could, and asked her to give it a try. He test cleaned a small patch with a scrubbing sponge. After less than a minute using the scrubbing sponge, Captain Larson cleaned off a patch of the baked-on-food residue from the left side panel of the stove. Mr. Greg Coleman, the mate on board the SALLY J at the time, testified by deposition that Captain Larson's getting down on his hands and knees to clean a small part of the stove was out of character for Captain Larson. Moore saw the cleaned patch, and at no time thereafter did she protest or ask for assistance in cleaning the remainder of the side of the stove.

8. Mr. Coleman testified it usually took about an hour or two to clean just the grease off the stove, but that cleaning would not remove the stains on the sides of the stove. Cleaning the oven was usually limited to getting the grease off to prevent a fire, and getting the food waste off to be sanitary.

9. Ms. Moore tried to clean the sides of the stove as ordered, but found it very difficult. Ms. Moore tried SOS pads, copper wire

scrubbers, Scotch Brite sponge pads, grill screens, Simple Green, lemon juice, vinegar, pickle juice, and sandpaper to manually clean the sides of the stove as ordered. There was no safe cleaner or device on board the SALLY J that would clean off the stains as Ms. Moore was ordered to do. Ms. Moore even asked the vessel engineer for a sander to sand off the stains. The engineer said no sander was on board.

10. Western Pioneer alleges that oven cleaners such as "Mr. Muscle," a caustic solvent normally used to clean the interior of a stove, should have been used to clean the external surface of the stove. Based on the oven cleaner label, the material data safety sheet, and the testimony of Mr. Thomas Way, a Certified Professional Ergonomist, such use would be a misapplication of oven cleaner. Use of the oven cleaner to clean the outside of the galley stove in an enclosed galley on a moving vessel would create an unseaworthy condition. Oven cleaner is not fit for the purpose of cleaning the outside of the galley stove while the vessel is underway. In addition, Ms. Moore reasonably believed that the sides of the stove were aluminum. Although experts for each side tested the stove sides and agreed that the sides were in fact polished carbon steel, this was not readily apparent to Ms. Moore. The type of oven cleaner defendant contends should have been used, such as "Mr. Muscle," has warnings stating that it should not be used on aluminum surfaces. On the first day of cleaning the stove, Ms. Moore cleaned the sides of the stove from 4:00 a.m. until 10:00 p.m. Ms. Moore stopped during the day to make meals for the crew. After making meals for the crew, Ms. Moore went back to work scrubbing the ingrained stains on the stove. The next day, Ms. Moore worked from 4:00 a.m. to 3:00 p.m., again with breaks for making meals. Ms. Moore estimates she spent between 15 and 20 hours cleaning the stove.

11. While cleaning the galley stove "like new," Ms. Moore was not supervised. No one had instructed Ms. Moore on how to clean the stove.

12. Ms. Moore made the sides of the stove as clean as she could by hand. When Captain Larson inspected the stove, he said he was satisfied with Ms. Moore's results and knew Ms. Moore could get the job done.

13. Prior to the captain's request to clean the stove, there was an "incident" between Captain Larson and the plaintiff. The Court, in a previous ruling, excluded evidence about the incident. However, as a result of the incident, the working arrangement between the two was strained.

14. Ms. Moore failed to use reasonable care in connection with the work she accomplished. Although she found it very difficult to clean the stove like new, she failed to ask for help, advise the Captain or mate of the difficulty, or otherwise take steps to avoid the harm and resulting injury caused by 15 to 20 hours of hard repetitive work. Plaintiff also aggravated the injury by returning to work before the injury was properly treated. The Court concludes that Ms. Moore's fault should be assessed at 35% of the injury.

15. After the scrubbing job, Ms. Moore suffered swelling and soreness of her wrists, forearms and hands. On April 17, 1996, Ms. Moore was seen at Peterson Chiropractic for an unrelated neck and back adjustment. The chart notes indicate Ms. Moore was suffering pain at her wrists and forearms. (Exhibit 9) The chiropractor recommended that Ms. Moore see a doctor at the nearby Highline Walk–In Clinic.

16. On April 18, 1996, Ms. Moore went to the Highline Walk–In Clinic where she was seen by J. Britten, M.D. The doctor's chart notes makes several references to pain and discomfort Ms. Moore was suffering at and behind her right thumb. Ms. Moore was diagnosed as having DeQuervain's tenosynovitis and was provided a wrist splint for her right hand that she was to wear for two weeks. (Exhibit 10).

17. Dr. Britten did not give Ms. Moore an unfit for duty slip, nor did he tell her she should not return to work.

18. Ms. Moore thought her right hand would get better with time, so she returned to work on trip no. 107 on or about May 3, 1996. At that time, Ms. Moore did not realize how much damage had been done to her thumbs. Ms. Moore thought she was able to perform her duties as a cook. Nevertheless,

Ms. Moore continued to wear the brace she was given at the Highline Walk–In clinic whenever she could. However, Ms. Moore found that doing her job was painful. The pain in Ms. Moore's hands did not go away.

19. When Ms. Moore returned to work on May 3, 1996, for trip no. 107, she did not advise the defendant, or its representatives, that she had sustained an injury on trip no. 106. In her contract she signed on May 3, 1996 for trip no. 107, Ms. Moore warranted that she was fully fit for performing the essential functions of her job, and that she had no physical disabilities or lingering injuries at that time that would limit her performance except for those listed. In the space reserved for listing such limiting conditions, Ms. Moore stated "NONE." That statement was not true.

20. When Ms. Moore joined the vessel for trip no. 107, Captain Larson saw her with a brace on her hand. He assumed she had been treated by a doctor paid for by Western Pioneer, and thus assumed she had received a medical release to return to work. He asked Ms. Moore if she could work, and she said yes. At no time between trip nos. 106 and 107 did Ms. Moore fill out an injury report, which she knew was required by the company.

21. During trip no. 107, Ms. Moore performed her normal duties as a cook, including cleaning. Ms. Moore was required to remove the brace from her right hand whenever she was cooking or cleaning. She favored her right hand, and testified that during the normal course of working that trip, she overworked her left hand. She was frequently required to remove her hand braces while working. No separate incident occurred on trip no. 107 that led to her left hand and thumb injury.

22. Upon her return home from trip no. 107, Ms. Moore returned to the Highline Walk–In Clinic on May 29, 1996. The chart notes from the clinic state Ms. Moore had been suffering from pain in her wrists for six weeks or since April 1996 (during trip no. 106). (Exhibit 10).

23. Ms. Moore was referred to Dr. Wise, a plastic and reconstructive hand surgeon.

Dr. Wise was primarily in charge of Ms. Moore's treatment from that point on.

24. On June 4, 1996, Dr. Wise examined Ms. Moore. The chart notes for that date state:

> She[Ms. Moore] states that she had the onset of bilateral hand and wrist pain following one particular project on one trip recently what she calls trips number 106 and 107.
>
> . . . She had a stove on one of the ships that had a porous aluminum side, and her captain wanted it "clean like new."

(Exhibit 11).

25. Dr. Wise testified that the type and nature of the injuries Ms. Moore presented with on June 4, 1996, were consistent with her reported history of cleaning the stove. On a more probable than not basis, the injuries were the result of Ms. Moore's cleaning the stove on the SALLY J as ordered by Captain Larson. No medical evidence is offered to contradict this view, and it is accepted by the Court.

26. Dr. Wise first tried conservative care, consisting of physical therapy, injections, and use of a number of braces and casts, without success. Some of Ms. Moore's injuries cleared up with conservative care. Others did not.

27. Eventually, Dr. Wise performed excision interposition arthroplastic surgery on each of Ms. Moore's thumbs. The tissue inserted between Ms. Moore's joints came from a graft from her groin. After each of the two surgeries, the surgery site was attacked by cellulitis. This was a very painful infection, secondary to surgery. Each time, Ms. Moore was hospitalized and given intravenous antibiotics. (Exhibit 11).

28. In August 1997, Ms. Moore was diagnosed with multiple sclerosis. As a result, she has been required to use a walker to assist her. The use of the walker has aggravated her injury.

29. Dr. Wise released Ms. Moore from medical care on October 20, 1997. This Court accepts Dr. Wise's opinion that Ms. Moore's cleaning of the galley stove on the SALLY J was the cause of the medical conditions described and treated by Dr. Wise.

30. There is no medical evidence that Ms. Moore's multiple sclerosis played any part in the condition of her thumbs.

31. The objective testing by Dr. Becker, a physical capacities expert, proves that Ms. Moore suffered a significant injury to the base of her thumbs bilaterally. Among other things, there is a significant deficit in Ms. Moore's ability to apply force through her thumbs in compression (grasping). Dr. Becker found Ms. Moore to no longer be able to perform the vast majority of grasping tasks or to use the vast majority of tools required in commercial cooking. Due to her significantly compromised thumbs, Dr. Becker found Ms. Moore able to perform only sedentary to light levels of work. (Exhibit 18)

32. Mr. Nader Spahi, a vocational expert, testified that despite the conditions resulting from Ms. Moore's injury on the SALLY J and her multiple sclerosis, Ms. Moore could perform certain light duty jobs, provided she receives retraining, and accommodations are made at the workplace for her conditions. (Exhibit 17) However, at all times since August 1997, Ms. Moore would not be fit to work in the fishing industry as a result of the intervening multiple sclerosis.

33. Western Pioneer failed to put forward any vocational evidence to demonstrate that there were jobs available to Ms. Moore that she could do if she did not have multiple sclerosis, and that would pay any amount greater than the jobs proposed by Mr. Spahi.

34. As a proximate result of the injury, Ms. Moore has lost wages from June 1, 1996 to August 1, 1997 in the amount of approximately $20,500. Ms. Moore has demonstrated she can earn $37,380 per year as a cook. (Exhibit 17) Ms. Moore's payroll stubs from January 24, 1996, to June 1, 1996, show earnings of $12,460. Ms. Moore's average income during the five years prior to the injury was approximately $17,500. The Court finds that a five-year average is appropriate to use because Ms. Moore did not always work even when work was available. The Court finds, using $17,500 as an average, that she lost past wages for a period of 14 months or $20,500.

35. Despite the conditions resulting from Ms. Moore's injury on the SALLY J and her multiple sclerosis, Ms. Moore can perform light duty jobs, provided she receives six months of retraining, and accommodations are made at the work place for her conditions. Ms. Moore could work as a customer service representative with a voice activated computer or as a receptionist and she could earn a competitive wage. To perform this job, Ms. Moore requires $6,330 in retraining costs. (Exhibit 17)

36. With six months retraining, Ms. Moore could earn approximately $12,000 per year working as a receptionist or sales representative. (Exhibit 17) Defendant failed to pay plaintiff to retrain, and should be held responsible for additional lost wages from August 1, 1997 to date of trial of $1000 per month. Plaintiff should also recover $1000 per month during the period necessary for retraining which the Court finds to be six months. After retraining, plaintiff will be able to earn the same amount she would have earned with multiple sclerosis after retraining. Thus, plaintiff is entitled to an additional award of loss of wages of $14,000. Plaintiff is not entitled to future wage loss after the period of retraining.

37. While working for Western Pioneer, Inc., Ms. Moore was provided medical and dental insurance which had monthly premiums of $141.71 and $26.54 respectively. (Exhibit 24) These benefits were terminated on August 6, 1997. (Exhibit 24) Replacing these benefits will cost $2,019 per year. The Court finds the cost of these benefits is not recoverable because Ms. Moore has been or will be paid all medical costs incurred prior to August 1997.

38. Ms. Moore has experienced physical injuries, emotional injuries, pain and suffering, loss of enjoyment of life, and other similar general damages, some of which will continue for the rest of her life, as a proximate result of the injuries she sustained from cleaning the stove on the SALLY J. Based on all the evidence presented, a reasonable award would be $125,000.

39. Ms. Moore was entitled to payment of maintenance at the rate of $30 per day as per the crew contract (Exhibits 3 and 4) until she

reached maximum medical cure, which this court finds occurred on October 20, 1997.

40. The Court finds that beginning by December 1996, defendant had evidence to place them on notice as to the nature and extent of plaintiff's claimed injuries, including the fact that cure was ongoing. Ms. Soriano, defendant's risk manager, candidly admitted at trial that by November 1996 defendant knew that Dr. Wise was very much involved in treating plaintiff, that no defendant representative called Dr. Wise's office, that Ms. Moore had told Ms. Soriano in August of 1996 that Ms. Moore had signed all necessary medical releases, and that the defendant did not follow its own company procedures when it failed to investigate this claim. Defendant's own standard procedures included calling the treating physicians directly to obtain medical information. Defendants failed to take any steps to investigate the claims, and their refusal to pay maintenance and cure after December 1996 was willful and persistent. All maintenance and cure was paid immediately before trial in March 1998.

41. Defendant asserts it did not pay maintenance and cure as it was not until the recent deposition of Dr. Wise that they knew Ms. Moore's condition was related to the injuries she received on the vessel. However, defendant had Dr. Wise's chart notes, as well as notice of anticipated surgery, and failed to take any steps to investigate the request for maintenance and cure in a timely fashion. Further, Dr. Wise's testimony was limited by the Court to testimony about his medical notes only, and this information has been available, through discovery, to Western Pioneer since December 1996.

42. The defendants' failure to investigate was caused at least in part by plaintiff's counsel's refusal to provide documentation or meet with the defendants' representatives after a request for a meeting in late 1996. Plaintiff's counsel's action contributed 25% to the ultimate failure to pay maintenance and cure.

43. This Court finds the defendants' failure to pay the maintenance and cure owed Ms. Moore was willful and persistent, and that Ms. Moore is owed reasonable attorney fees incurred to collect her maintenance and cure, as well as the related costs, including the perpetuation deposition of Dr. Wise. However, plaintiff's counsel should not benefit from his own misconduct. Accordingly, the Court will award 75% of the reasonable attorney's fees incurred by plaintiff after December 31, 1996 relating to the issue of maintenance and cure. Plaintiff's counsel is directed to submit a request for attorney's fees within 10 days of the entry of these Findings.

44. Ms. Moore has also lost the benefit of the board that would have been provided to her on board the vessel (commonly referred to as "found"). Ms. Moore would work an average of 6 to 8 trips a year, with each trip lasting approximately a month. Ms. Moore testified her board was $150 per month. Therefore, Ms. Moore has suffered a loss of found in the amount of $150 per month through July 31, 1997 for a total of $2100. The Court makes no award for loss of her room costs of $475 per month because she would have maintained her living conditions whether or not she worked.

45. Defendants' initial investigation of this claim was hindered in part because Ms. Moore initially reported that the incident in question occurred in January or February 1996 on trip no. 104. Defendants' representatives initially interviewed crew members on trip no. 104 without discovering relevant facts. It was not until after the plaintiff's deposition and later corrections to that deposition that trip no. 106 was determined to be the trip in question.

## II.

### CONCLUSIONS OF LAW

1. The Court has admiralty and general maritime law jurisdiction over this case pursuant to 26 U.S.C. § 1333, as well as under the Jones Act, 46 U.S.C.App. § 688.

2. Ms. Moore has established by a preponderance of the evidence that her injury was caused by the unseaworthiness of the vessel. Ms. Moore was required to clean the vessel stove "like new" when there was inadequate equipment on board the vessel to accomplish this task. *See Havens v. F/T Polar Mist,* 996 F.2d 215, 217–18 (9th Cir.1993);

*Webb v. Dresser Industries,* 536 F.2d 603, 606 (5th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977). This condition also constituted negligence under the Jones Act (46 U.S.C.App. § 688). *See Cobb v. Rowan Companies, Inc.,* 919 F.2d 1089, 1090 (5th Cir.1991).

■ 3. The inadequate supervision of Ms. Moore also created an unseaworthy condition, and constituted negligence under the Jones Act. Ms. Moore worked 15 to 20 hours in a period of one and a half days to get the sides of the stove clean as ordered by Captain Larson. *See Elms v. Crowley Marine Service, Inc.,* 1997 A.M.C. 835 (W.D.Wash. 1996).

■■ 4. Defendant was willful and persistent in its refusal to pay maintenance and cure as demonstrated by defendant's failure to pay maintenance and cure for over a year while in possession of medical records indicating treatment was ongoing and surgery was planned. Western Pioneer's defense that the medical records were contradictory is not an adequate reason to fail to pay maintenance and cure. Any doubts as to entitlement, necessity of medical treatment, and the attainment of maximum medical cure must be resolved in favor of the seaman and in favor of payment of maintenance and cure. *Vella v. Ford Motor Company,* 421 U.S. 1, 95 S.Ct. 1381, 43 L.Ed.2d 682, 1975 A.M.C. 563 (1975); *Johnson v. Marlin Drilling Co.,* 893 F.2d 77, 1990 A.M.C. 2460 (5th Cir.1990). However, plaintiff's counsel should not benefit from his failure to provide documents or meet with defendants' representatives. Therefore, Ms. Moore is entitled only to 75% of her attorney's fees and costs, including all costs associated with the deposition of Dr. Wise that triggered the payment of maintenance and cure during the period January 1, 1997 to date of trial. *Glynn v. Roy Al Boat Management Corp.,* 57 F.3d 1495, 1504–05 (9th Cir.1995), *cert. denied,* 516 U.S. 1046, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996). The amount of attorney fees and costs will hereafter be determined.

■ 5. In admiralty, an injured seaman is entitled to prejudgment interest not only on his fixed costs, but also on the amount awarded for pain and suffering and any other intangible losses. Prejudgment interest must be awarded unless peculiar circumstances justify its denial. *Vance v. American Hawaii Cruises, Inc.,* 789 F.2d 790, 794–95 (9th Cir.1986).

Normally, the interest rate prescribed for post-judgment interest in 28 U.S.C. § 1961 is applied unless the equities of the case demand a different rate. *See Western Pacific Fisheries, Inc. v. S.S. President Grant,* 730 F.2d 1280 (9th Cir.1984) .... A court may choose a local rate of interest in its discretion, if the equities demand. *Columbia Brick Works, Inc. v. Royal Ins. Co.,* 1986 A.M.C. [1676] at 1683, 768 F.2d [1066] at 1071 [ (9th Cir.1985) ]. The applicable Washington rate is 12 percent. R.C.W. 19.52.

*Prosser v. F/V CRYSTAL VIKING,* 1993 WL 668292, 1994 A.M.C. 859, 863 (W.D.Wash. 1993). The court has broad discretion to determine the rate of interest to accomplish just restitution of injured parties. *Columbia Brick Works,* 768 F.2d at 1068. Here the equities are such that the Court should award the local rate of interest in the State of Washington, which is 12%. Prejudgment interest began to run from the date of Ms. Moore's injury. The exact date of injury is not known, so interest will run from the date the SALLY J ended trip no. 106 on April 13, 1996, and will be computed at the rate of 12%.

■ 6. Ms. Moore's recovery is not barred under the primary duty doctrine. Generally, this doctrine is applied only to vessel officers and not to unlicensed seamen. *Villers Seafood Co., Inc. v. Vest,* 813 F.2d 339, 342, 1987 A.M.C. 1850 (11th Cir.1987); *White v. Maritime Overseas Corp.,* 1989 A.M.C. 2070 (Cal.App.1989); 1 T. Schoenbaum, Admiralty and Maritime Law § 6–24 at 330 (2d ed.1994). In order for this doctrine to apply: (1) the seaman must have consciously assumed a duty as a term of employment; (2) the dangerous condition that injured the seaman must have been created by the seaman or could have been controlled or eliminated solely by the seaman in the proper exercise of his or her employment duties; and (3) the seaman must have knowingly

violated a duty consciously assumed as a condition of employment. *Bernard v. Maersk Lines, Ltd.,* 22 F.3d 903, 906, 1994 A.M.C. 1663 (9th Cir.1994). None of these elements apply to Ms. Moore's claim.

7. Ms. Moore was contributorily negligent to the extent of 35% fault. Any recovery of damages should be adjusted accordingly.

8. Defendant has raised the affirmative defense that Ms. Moore's multiple sclerosis should be considered as an intervening, superseding or independent cause relieving defendant from liability for wage loss. However, this argument is rejected by the Court. Both the hand injuries and the subsequent multiple sclerosis have resulted in parallel harm—that of making Ms. Moore unable to work as a vessel cook, limiting her to light duty jobs on shore. Defendant should not be relieved of its responsibility for the damage it did to Ms. Moore simply because Ms. Moore was subsequently struck by an unrelated disabling disease. Accordingly, there is no need to apportion damages between loss of income caused by her hand injuries and her multiple sclerosis. *Buchalski v. Universal Marine Corp.,* 393 F.Supp. 246, 1975 A.M.C. 1174 (W.D.Wash.1975) (subsequent heart attack did not relieve seaman's employer from damages for loss of income attributable to back injury).

9. Ms. Moore is entitled to judgment against the defendant as follows:

| | |
|---|---|
| Past wage loss to trial (FF 34) (FF 36) | $ 34,500 |
| Retraining costs (FF 35) | $ 6,330 |
| Pain and suffering and loss of enjoyment of life | $125,000 |
| Found (FF 44) | $ 2,100 |
| **TOTAL** | $167,930 |

| | | |
|---|---|---|
| Total damages | $167,930 | |
| Less 35% contributory negligence (FF 14) | | (58,775) |
| Net damages | | $109,155 |
| Prejudgment interest (CL 5) | | 25,963 |
| **TOTAL JUDGMENT AMOUNT** | | $135,118 |

10. Ms. Moore is entitled to recover judgment against the defendant in total amount of $135,118 together with taxable costs. Ms. Moore is also entitled to recover 75% of the amount of attorney fees and costs incurred in obtaining maintenance and cure, the precise amount of which will be determined at a later date.