298 F.3d 1090
 NORTHERN QUEEN INC., an Alaska corporation, as owner and operator of the F/V LIN J, Official No. 538018, for exoneration from or limitation of liability, Plaintiff-Appellee,
v.
Kathryn KINNEAR, the Estate of Blake Kinnear, Claimant-Appellant.
 No. 00-36093.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 13, 2002.
 Filed August 7, 2002.
 
 1
 COPYRIGHT MATERIAL OMITTED Michael A. Barcott and Nina M. Mitchell, Holmes, Weddle & Barcott, Seattle, WA, for the claimant-appellant.
 
 
 2
 Donald P. Marinkovich, LeGros, Buchanan & Paul, Seattle, WA, for the plaintiff-appellee.
 
 
 3
 Appeal from the United States District Court for the Western District of Washington; Marsha J. Pechman, District Judge, Presiding.
 
 
 4
 Before B. FLETCHER and GOULD, Circuit Judges, and MURGUIA,* District Judge.
 
 OPINION
 
 5
 MURGUIA, District Judge.
 
 
 6
 Northern Queen, Inc. ("Northern Queen") brings this matter pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 181 et seq. After its fishing vessel tragically sank with all hands on board, Northern Queen brought suit seeking to limit its liability to the estate of the vessel's Captain. After a half-day bench trial, the district court entered judgment for Northern Queen, holding that the primary duty doctrine precluded the Captain's estate from recovering. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, and we affirm.
 
 I.
 
 7
 Northern Queen is a small family-owned corporation that had two principal shareholders: Blake Kinnear ("Kinnear"), the president, managing agent and captain of the corporations primary asset the fishing ship LIN J (the "vessel" or the "LIN J"), and Kinnear's mother Linda Kinnear, the corporation's secretary/treasurer.[1]
 
 
 8
 In March 1999, American vessels were completing the Opelio crab season in the northwest section of the Bering Sea.[2] One such ship was the Lin J. On March 9, 1999, Kinnear sent e-mails to his mother and his wife, indicating that the weather was turning bad and that ice was becoming a concern.[3] Several days later, on March 15, 1999, crabbing was interrupted when the wind blew ice flows through the vessels' fishing gear.[4] That night the weather continued to worsen, and the vessel spent the next two days gathering crab pots and preparing to return to port. By March 17, 1999, the vessel had gathered 62 crab pots, brought aboard approximately 55,000 pounds of crab, and began to head southeast to the Pribiloff Islands to deliver its load to a fishing cannery.
 
 
 9
 That evening Kinnear sent an email to the cannery stating:
 
 
 10
 Trying to make it to you by tomorrow night but slow going. My idea is to follow the ice edge for lee to keep from making spray, but so far it is pretty ragged, lots of zigzags and have to jog slow. Probably have to stop and chop ice off the boat often. Liable to be 30-36 hrs getting to you at this rate.
 
 
 11
 Throughout the day weather and icing problems continued, and Kinnear sent another e-mail twelve hours later to the cannery stating:
 
 
 12
 We have a load of gear on and are headed your way, naturally the [weather] and icing are a problem. Now we are getting an intermittent bilge alarm from the lazarette and can't seem to pump it. We are 6 hours from St. Paul now and may decide to stop and store the gear there if the alarm gets to be steady. I'll let you know.
 
 
 13
 A little over six hours after Kinnear's previous e-mail, at approximately 13:43 Alaska Standard time (22:43 UTC), the vessel sent out a distress call indicating that it was capsizing. Shortly thereafter, the vessel capsized and sank. Tragically, all hands on board were lost.
 
 
 14
 In a timely manner, Northern Queen commenced the current action seeking exoneration from or limitation of its liability for the accident under the Limitation of Liability Act, 46 U.S.C. §§ 181 et seq.[5] On September 5, 2000, a half-day bench trial was held before the district court. Prior to trial the parties stipulated that the vessel capsized and sank due to instability, which was "caused by an excessive ice buildup on the vessel and the water in the lazarette, although the precise amount of water is unknown." The parties also stipulated that the Lin J traveled at an average speed of 5 to 6 knots from the time Kinnear sent the March 17 e-mail to the cannery until the time the vessel sank. At trial, the main witness offered by the Estate of Kinnear (the "Estate") was Greene Cowan ("Cowan"), a former engineer on the Lin J who served under Kinnear from 1984 to 1994.
 
 
 15
 During trial evidence was presented concerning the icing conditions faced by the Lin J. "Icing" is the buildup of ice on a ship's superstructure caused by the spray of water from wind and waves in sub-freezing temperatures. Excessive ice buildup renders a vessel unstable, which can cause a vessel to capsize. To prevent ice buildup, in icing conditions it is the typical industry practice to curtail a vessel's speed to reduce the spray of water. Cowan testified that, when icing was a concern, Kinnear would travel at a speed of no more than 1 to 2 knots.
 
 
 16
 Evidence was also presented concerning the bilge alarm in the lazarette. The lazarette is an enclosed space in the stern of the vessel covered by the deck and used for storing extra line, bait jars and miscellaneous gear. A float alarm is installed in the lazarette, that is triggered when the water rises. Cowan testified that an intermittent alarm, such as Kinnear reported in his last e-mail, is caused by approximately 350 gallons of "water sloshing around in the lazarette, sloshing back and forth, just raising the float and then dropping it, raising it, dropping it." The intermittent alarm would become constant when approximately 400 gallons of water filled the lazarette. Cowan further testified that the only access to the lazarette was through a watertight deck hatch, which, under normal weather conditions, was blocked by crab pots. However, in icing conditions, Cowan testified, the vessel would carry no more than 25 pots to prevent excessive ice from accumulating on the vessel. At the time of the sinking, Kinnear's e-mails indicated that he had 62 pots on board, thereby blocking access to the lazarette.
 
 
 17
 On September 22, 2000, the district court issued its findings of fact and conclusions of law, in which it found that:
 
 
 18
 [T]he capsize of the Lin J is attributable to the decisions made by Blake W. Kinnear as captain of the vessel ... The Court finds that it is more probable than not that the vessel was traveling too rapidly in the hours before the casualty to avoid excessive icing and to permit removal of the ice build-up, and that the presence of 62 crab pots on board prevented the situation involving the lazarette from being corrected."
 
 
 19
 Based on this finding the district court determined that Northern Queen was not entitled to exoneration or a limitation under the act because the vessel was unseaworthy at the time it sank. However, under the affirmative defense of the primary duty doctrine, the district court determined that, because Kinnear had knowledge of the unseaworthiness of the vessel and failed to adequately respond or correct those conditions in his capacity as captain, Northern Queen was not liable to the Estate. The Estate appeals this determination, as well as the district court's finding that Kinnear failed to take adequate measures to prevent or correct the condition in the lazarette.
 
 II.
 
 20
 We review a district court's conclusions of law de novo. Exxon Co. v. Sofec, Inc., 54 F.3d 570, 573 (9th Cir.1995). A district court's findings of fact, however, are reviewed under the clearly erroneous standard. Id., at 576.
 
 III.
 
 21
 A. Did the district court err in finding that Kinnear failed to take adequate measures to prevent or correct the accumulation of water in the lazarette?
 
 
 22
 Based on the evidence presented at trial, the district court found it "more probable than not ... that the presence of 62 crab pots prevented the situation involving the lazarette from being corrected."
 
 
 23
 While Appellant concedes that Kinnear had "the duty to take reasonable measures to prevent water in the lazarette from becoming a problem, or to correct the problem, if possible, once it arose," it argues that there was insufficient evidence presented at trial to support the district court's finding. In arguing that the district court was in error, Appellant points to the fact that carrying 62 pots did not violate the vessel's safety standards and theorizes that it may have been dangerous to attempt to dump the extra pots.[6] Appellant also argues that, while there are e-mails to demonstrate that Kinnear was aware of the problem in the lazarette, there is no affirmative evidence as to what Kinnear did or did not do to correct this problem, and thus the district court's finding is, at best, speculation
 
 
 24
 "We review for clear error the district court's findings of fact following a bench trial. This standard is significantly deferential, and we will accept the lower court's findings of fact unless we are left with the definite and firm conviction that a mistake has been committed." Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir.2002).
 
 
 25
 Based on the evidence presented at trial, it cannot be said that the district court's finding concerning the lazarette was in error. The parties have stipulated that the water in the lazarette was a cause of the instability of the vessel. Prior to the sinking it is undisputed that Kinnear was aware of intermittent bilge alarms in the lazarette. It is also undisputed that, at the time of the sinking, the vessel was carrying 62 crab pots. At trial, Cowan testified that it was typical in icing conditions for Kinnear to carry no more than 25 pots, and that with 62 pots on board access to the lazarette would have been impossible. Based on this evidence, and an evaluation of the credibility of Cowan, the district court found that the presence of 62 crab pots prevented Kinnear from taking adequate measures to address or correct the bilge alarm in the lazarette. Appellant points to no evidence that indicates the district court was wholly mistaken in this conclusion. Accordingly, the district court did not commit clear error by finding that Kinnear failed to take adequate measures to prevent or correct the accumulation of water in the lazarette.
 
 
 26
 B. Did the district court err in concluding that Northern Queen satisfied all the elements of the primary duty rule?
 
 
 27
 Under the primary duty rule, "a seaman-employee may not recover from his employer for injuries caused by his own failure to perform a duty imposed on him by his employment." California Home Brands, Inc. v. Ferreira, 871 F.2d 830, 836-837 (9th Cir.1989)(citing Reinhart v. United States, 457 F.2d 151 (9th Cir. 1972)); see also, Wilson v. Maritime Overseas Corp., 150 F.3d 1, 11 (1st Cir. 1998)("The primary duty rule provides that a ship's officer may not recover against his employer for negligence or unseaworthiness when there is no other cause of the officer's injuries other than the officer's breach of his consciously assumed duty to maintain safe conditions aboard the vessel.").
 
 
 28
 We have established limitations on the use of the primary duty rule. First, the duty "will not bar a claim of injury arising from the breach of a duty that the plaintiff did not consciously assume as a term of his employment. Second, the rule does not apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated. Third, the rule applies only to a knowing violation of a duty consciously assumed as a term of employment." Bernard v. Maersk Lines, Ltd., 22 F.3d 903, 907 (9th Cir.1994).
 
 
 29
 Accordingly, in order for an employer to relieve itself of liability under the primary duty rule:
 
 
 30
 (1) the seaman must have consciously assumed a duty as a term of employment; (2) the dangerous condition that injured the seaman must have been created by the seaman or could have been controlled or eliminated solely by the seaman in the proper exercise of his or her employment duties; and (3) the seaman must have knowingly violated a duty consciously assumed as a condition of employment.
 
 
 31
 Moore v. The Sally J., 27 F.Supp.2d 1255, 1262-63 (W.D.Wash.1998).
 
 
 32
 Concluding that Northern Queen had met each prong of the rule, the district court determined that the Estate's claims were barred by the rule. In so ruling the Court found that:
 
 
 33
 As captain of the [vessel], Blake Kinnear assumed responsibility for operating the vessel safely. He is the sole person who could have taken corrective action to control or eliminate the dangerous conditions that caused the vessel to capsize. Furthermore, the record reflects that he knew of the dangerous conditions and that he more likely than not failed to take adequate actions to respond to such conditions.
 
 
 34
 1. Did Kinnear consciously assume a duty as a term of his employment?
 
 
 35
 "In order for the primary duty rule to apply, the employee must have failed to perform a specific, positive duty for which he had primary responsibility." California Home Brands, 871 F.2d at 836 n. 3. At trial the parties stipulated that Kinnear, as captain, had the duty to operate the vessel safely. It is on this duty that the district court based its decision. Appellant argues, however, that the stipulated duty is of such a general nature that based on that alone the primary duty rule cannot apply. Appellant is incorrect.
 
 
 36
 Kinnear's duty to operate the vessel in a safe manner was a specific duty that was unique to the job of captain. None of the other crewman are ultimately responsible for the safety of those on board. Thus, while a ship's captain may have many more duties than an average crewman, and while some of those duties may be quite wide in scope, such as the ultimate responsibility for the safety of all crew on board, those duties are not general in nature. The role of a ship's captain is highly specific and requires a vast amount of skill and experience. As one court has stated:
 
 
 37
 "[I]t is the nature of the calling of the shipmaster to know of the tempestuous forces of wind and tide and seas. He has to make assessments often from confusing or inadequate facts and then translate them into effective decisions. He cannot, therefore, trust to some providential intuition. He must be informed and experienced in the critical evaluation of data. Hence, he may not justify an erroneous judgment merely because others not similarly trained or charged with responsibility reached a like conclusion. Second, he has under his command a thing which may be the instrument of further damage — here a large cumbersome, unmanned, unwieldy craft which, once loosed before these forces, would smash all in her path. He has, therefore, a special duty to take all reasonable steps consistent with safety to this ship and her crew, to avoid or minimize the chance of harm to others."
 
 
 38
 Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 84-85 (5th Cir.1960).
 
 
 39
 On March 17 until the time the vessel sank, Kinnear's duty to operate the vessel in a safe manner required him to respond appropriately to the conditions with which he was confronted, the increasingly worsening weather and the bilge alarm in the lazarette. To the extent that Kinnear violated that duty causing injury to himself and others, the primary duty doctrine would limit his employer's liability for his injuries.
 
 
 40
 2. Was the dangerous condition that injured Kinnear created by him or could it have been controlled or eliminated solely by Kinnear in the proper exercise of his or her employment duties?
 
 
 41
 Appellant argues that the district court incorrectly concluded that Kinnear alone could have taken the corrective action necessary to control or eliminate the dangerous conditions that faced the vessel on March 17 until the time of the sinking. The evidence, however, is to the contrary.
 
 
 42
 As captain, Kinnear alone determined the speed and course of the ship, as well as the number of crab pots that could be stored safely on board. At trial, the evidence demonstrated that the decisions Kinnear made in regard to those factors caused the vessel to become unstable, capsize, and then sink.
 
 
 43
 On the morning of March 18, Kinnear acknowledged that icing conditions were present and that the vessel would have to "jog slow," travel at 1 to 2 knots, in order to chop ice off the hull and prevent excess accumulation of ice on the vessel. The testimony of Cowan indicated that, under such conditions, the vessel would typically carry no more than 25 pots, so as not to weigh the vessel down and cause excessive water spray. At trial, the parties stipulated that, based on the distance covered by the vessel, Kinnear traveled at a rate of 5 to 6 knots, that the vessel, at the time of the sinking, was carrying 62 pots, and that one of the causes of the vessel's sinking was excessive ice. Based on this evidence, while appellant may argue that the speed of the vessel was not excessive and that the number of pots carried was appropriate, Kinnear's decision to travel at 5 to 6 knots and carry 62 pots full of approximately 55,000 pounds of crab, more probably than not, caused excessive icing on the vessel. That excessive icing could have been prevented or corrected solely by Kinnear.
 
 
 44
 On the morning of March 18 Kinnear also acknowledged that they were getting an intermittent "bilge alarm" in the lazarette, and that the water pump was not functioning. The only access to the lazarette was through a water tight hatch on the deck. However, the testimony of Cowan indicated that the presence of 62 pots, in addition to aiding the build up of ice on the vessel, also blocked access to the lazarette. Cowan further testified that if conditions warranted, the pots could be dumped into the ocean for later retrieval. At trial, the parties stipulated that water in the lazarette was a cause of the instability that led to the sinking. Accordingly, Kinnear's decision to carry 62 pots containing thousands of pounds of crab, more probably than not, prevented him from appropriately addressing the situation in the lazarette.[7]
 
 
 45
 In sum, the dangerous conditions confronted by the vessel on March 17 until the time it sunk, were created, in part, by Kinnear's decisions, and could have been controlled or eliminated by the proper exercise of his duties as Captain of the vessel.
 
 
 46
 3. Did Kinnear knowingly violate that duty he consciously assumed as a condition of employment?
 
 
 47
 The primary duty rule "does not apply to a momentary lapse of care by an otherwise careful seaman." Bernard, 22 F.3d at 907. Instead, for the rule to apply, there must be evidence of a conscious disregard of the seaman's duties. In the current matter, such evidence exists.
 
 
 48
 It is apparent from the e-mails sent by Kinnear that he was aware of both the icing conditions and the bilge alarms in the lazarette. It is also apparent that Kinnear was aware that these conditions posed a danger to the vessel. It was thus incumbent upon Kinnear, as the person ultimately responsible for the safety of the vessel and all those on board, to take appropriate measures to address those situations. Despite this, the evidence indicates that Kinnear chose to travel at an excessive rate of speed and chose to carry an excessive number of pots in light of the weather conditions, which prevented access to the lazarette. Such actions violated Kinnear's duty to operate the vessel in a safe manner. Appellant theorizes that Kinnear determined that he could reach the Pribiloff Islands safely, and merely miscalculated the danger to the vessel. Instead of consciously violating a duty, Appellant argues, Kinnear's decisions reflect conscious choices that resulted in unforeseeable tragedy. However, even if we were to accept Appellant's rationale, Kinnear's actions still violated his duties as captain. As has been detailed, the evidence plainly indicated that Kinnear was aware of both the icing conditions and the bilge alarm in the lazarette and was aware that these situations posed a danger to the safety of the vessel. Despite this Kinnear responded by acting in a manner wholly inconsistent with his, and other captains, typical behavior under such conditions. Consequently, Kinnear's choices violated his duty to operate the vessel safety.
 
 
 49
 Having met all of the prongs of the primary duty rule, Northern Queen has proved that Kinnear's death was caused by his own failure to carry out his consciously assumed duties as captain. As such, the district court was correct in ruling that Northern Queen is not liable to the Estate.
 
 IV.
 
 50
 Because the district court did not err in its findings that Kinnear failed to take adequate measures to correct the condition in the lazarette, nor in its application of the primary duty rule, the decision of the district court is
 
 
 51
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Mary H. Murguia, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The shares of Northern Queen were divided as follows: Blake Kinnear owned 22 percent, Linda Kinnear owned 77 percent, and Blake Kinnear's minor daughter owned one percent of the shares of Northern Queen
 
 
 [2]
 Opelio crab are more commonly known as Snow Crab
 
 
 [3]
 The vessel used a mobile phone with satellite service to send and receive e-mails. As stipulated by the parties at trial, the e-mails are identified by day, date and time in the header of the individual e-mail. The parties also stipulated that the times listed in the e-mail represent Greenwich Mean Time and Universal Mean Time, which are equivalent to each other and nine hours later than Alaska time
 
 
 [4]
 Crabbing is accomplished through the use of 7' × 7' × 3' "pots" which weigh approximately 700 pounds each
 
 
 [5]
 The estates of the various crewman reached settlements with Northern Queen. Consequently, the only claim considered by the district court was that of Kinnear
 
 
 [6]
 At trial no affirmative evidence was presented that dumping the crab pots would have posed a danger to the LIN J or its crew. However, even if such evidence had been presented, our ruling would not change
 
 
 [7]
 While we affirm the district court's factual findings regarding the lazarette under the clear error standard, the determination of whether the facts satisfy the elements of the primary duty rule involves a mixed question of law and fact that we review de novoBoone v. United States, 944 F.2d 1489, 1492 (9th Cir.1991) ("The application of a rule of law to established facts is reviewed de novo when the question requires consideration of legal concepts in mix of facts and law.").
 
 
 GOULD, Circuit Judge, dissenting:
 
 52
 While I agree with most of the majority opinion, I respectfully dissent from the conclusion that the third element of the primary duty rule, that Kinnear knowingly violated his duties, is adequately presented on this record. In my view, the record supports a conclusion of negligence, but not of knowing violation. As I see it, the district court's conclusion that Kinnear knowingly violated duties, and our affirmance of same, is based on undue speculation. I would reverse the district court's judgment.
 
 
 53
 Just as probable as the district court's theory of "knowing violation" is that the captain, knowing the ship was taking on water in the lazerette, might have been concerned that speed in getting to shore was more important than avoiding the increased icing that would come from speed. If we can speculate that the captain knowingly, and not merely negligently, disregarded his duties, we may just as well speculate that the captain was uncertain about the rate of water increase in the lazerette or other impairment of the ship and about its effect on the ship's stability.
 
 
 54
 This case presents a terrible tragedy: There is a tragic loss of life of captain and crew whose spirits were suddenly and finally extinguished by the frigid waters of the Bering Sea. We can do nothing about that. I decline to join the district court's view, and the majority's affirmance of it, because of my concern that it may be wrong, and that we are dealing with uncertainties too grave to permit the finding made by the district court.
 
 
 55
 I would not quarrel with the district court finding negligence, or in our affirmance of a finding of negligence. It is obvious that a bad choice was made, or more than one bad choice, and the evidence was sufficient to say that the captain's decisions were unreasonable as a matter of law. But the primary duty doctrine requires more than negligence. And absent more proof than was presented in the district court, I cannot accept the conclusion that the evidence was sufficient to show that the captain knowingly disregarded his duties.
 
 
 56
 Decision-making on the high seas in icy weather on an impaired ship will necessarily involve a balancing of risks, and it may be in such circumstances as were presented here that a threatened loss of property and life could not be surely avoided by any course. I respectfully dissent because the district court's conclusion here that life was lost because of knowing violation of a duty consciously assumed, and not merely because of Kinnear's negligent assessment of competing risks, is too speculative to stand. Based on the evidence in the record, we should rather believe that Kinnear more probably than not was trying to make the best of a bad situation, to use his best seafaring judgment to save the ship and lives of his crew.